IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 2, 2025

IN RE ZAIMEON M.[1]

**Appeal from the Juvenile Court for Washington County**
**No. JV1040          Jonathan Minga, Judge**

———————————————————

**No. E2024-00871-COA-R3-PT**

———————————————————

This action involves the termination of a mother's parental rights to her minor child. Following a bench trial, the court found that clear and convincing evidence existed to establish several statutory grounds of termination as applied to the mother. The court also found that termination was in the child's best interest. We now affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY ARMSTRONG, J., joined.

Chanler L., Newcomb, Tennessee, pro se appellant.

Jonathan Skrmetti, Attorney General & Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.      BACKGROUND**

Zaimeon M. ("the Child") was born to Chanler L. ("Mother") in February 2021 in West Virginia.[2] The Child lived with Mother without incident until October 4, 2021, when he was found unattended in a car in a Wal-Mart parking lot in Johnson City, Tennessee. The car was running, the windows were cracked, and the Child was positioned in a car seat;

---

[1] This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

[2] A father was listed on the Child's birth certificate; however, he was later excluded as the biological father of the child through DNA testing. No other putative fathers were identified.

however, the car seat was not installed properly. The Tennessee Department of Children's Services ("DCS") met with Mother, who admitted to taking a Xanax and smoking marijuana. She explained that the Child had not slept the night before and that she left him in the car to purchase a Halloween costume inside the store because he had fallen asleep. Mother submitted to a urine drug screen, which was negative for all substances.

DCS and Mother developed an Immediate Protection Agreement, and the Child was placed with a family. Four days later, on October 8, Mother appeared for a scheduled child and family team meeting. She submitted to a drug screen and tested positive for Methamphetamine, Amphetamine, THC, Ecstasy, and Benzodiazepines. DCS petitioned for removal of the Child on October 18, alleging drug exposure and housing instability. The trial court granted the petition and removed the Child, placing him in DCS custody. The Child was later adjudicated as dependent and neglected based upon Mother's stipulation to lack of housing, lack of income, and the need for alcohol and drug treatment.

On February 2, 2022, DCS developed a permanency plan, which was ratified by the trial court as amended to include the following requirements: (1) abstain from alcohol and drug use; (2) submit to random drug screens; (3) complete an alcohol and drug assessment and follow recommendations; (4) timely attend visitation with the Child; (5) maintain appropriate housing free from illegal activity; (6) provide verification of income; (7) comply with parenting education services; (8) maintain contact with DCS; (9) resolve criminal charges and not incur additional charges; and (10) seek behavioral stability through mental health services. Mother participated in the development of the plan and signed the Criteria and Procedures for Termination of Parental Rights, indicating her understanding of the terms. The plan was revised in September 2022 and again in February 2024; however, the requirements remained the same throughout the custodial episode.

Mother did not make much progress on the permanency plan requirements, failed drug screens, and was inconsistent with visitation. On January 17, 2023, DCS filed a petition to terminate, citing the following statutory grounds: (1) abandonment for failure to visit; (2) substantial noncompliance with the permanency plans; (3) the persistence of conditions which led to removal; and (4) failure to manifest an ability and willingness to assume custody of the Child. During the pendency of the hearing, the Child was moved to a pre-adoptive foster home in March 2023, where he has since remained.

The case proceeded to a hearing on the termination petition on April 1, 2024, at which Mother appeared pro se after firing her court-appointed attorney. Jill Price testified that she served as the Child's case manager for DCS from the time of his removal until March 2023. She recalled that Mother had one virtual visit with the Child in the four months prior to the filing of the termination petition. She explained that Mother last visited the Child in person in April 2022, at which time Mother's parents were asked to leave the visit due to their behavior. Ms. Price stated that she intervened when she noticed the Child choking on his snacks, prompting comments from the maternal grandparents. She

professed that the remainder of the visit between Mother and the Child continued without incident. She recalled that Mother visited the Child a total of 14 times throughout the custodial episode, from October 2021 through April 2024. Ms. Price testified that Mother was initially responsive and was visiting the Child on a regular basis for the first three or four months but that she lost contact with Mother, who did not have a cellular telephone and would call from other people's telephones. In an effort to find her, she drove around Johnson City, looking in areas where those without homes congregated. She also searched records and found her incarcerated at one point.

As to the requirements contained in the permanency plan, Ms. Price recalled that Mother was initially enrolled with Families Free, "a one-stop shop that coordinated all services." However, Mother expressed her dissatisfaction with the program, prompting Ms. Price to coordinate services separately. She coordinated services again when Mother moved out of state and then established services a third time once Mother moved back to Tennessee. Ms. Price testified that Mother participated in parenting education but failed to resolve her criminal charges, complete an alcohol and drug assessment, and obtain housing or a source of income. Mother also either failed her drug screens or refused to submit for testing. She noted that Mother tested positive for THC on November 17, 2021; refused testing on February 17, 2022; tested positive for Amphetamine, Methamphetamine, Ecstasy, Benzodiazepines, and THC on April 1, 2022; refused testing on April 14, 2023; and refused a court-ordered hair follicle test in February 2024. She professed that Mother was in essentially the same position she was in at the time of removal with no proof of housing, no proof of income, and in need of drug treatment.

Emily Ford, the Child's current DCS family service worker, testified that the Child is doing really well in his pre-adoptive placement. She noted that he referred to his foster parents as "mommy" and "daddy" and that he is also bonded with a foster sibling in the house. He attends daycare throughout the week and church with the foster family on a weekly basis. He is meeting his developmental milestones and "thriving" in his current placement. She asserted that Mother "sporadically" remitted child support and contacted her for visitation. The Child did not even recognize Mother at his most recent virtual visit in March 2024. Ms. Ford explained that the Child asked her if Mother was her friend.

The foster mother testified, confirming her love for the Child and expressing a desire to adopt him. She noted that the Child enjoys a sibling bond with his foster brother and their extended family. She stated that the Child receives behavioral services through Tennessee's early intervention program and has evidenced improvement in the program.

Mother testified that she lost "everything" at the time of the Child's removal, namely her employment, her housing, and her transportation. She explained that she was not "in a good spot" mentally and that she made some very bad decisions that delayed the process of reuniting with the Child. She expressed regret for wasting time when the Child should have been her top priority. She continued,

- 3 -

I don't feel like my rights should be taken away because I recently have been trying to achieve everything on the Permanency Plan and I know it's overdue, long overdue. I feel like I would make a good mother for [the Child] because he's my whole heart. I didn't know love until him.

Following the hearing, the court issued a final order in which it found that the evidence presented established the statutory grounds of (1) abandonment by failure to visit; (2) substantial noncompliance with the permanency plans; and (3) the persistence of conditions which led to removal. The court held that the evidence did not support a finding of failure to manifest an ability and willingness to assume custody of the Child. The court found that termination of Mother's parental rights was in the best interest of the Child. This appeal followed.

## II.    ISSUES

We consolidate and restate the issues pertinent to this appeal as follows:

A.    Whether clear and convincing evidence supports the court's finding of statutory grounds for termination.

B.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Child.

## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

- 5 -

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## IV.    DISCUSSION

We begin by acknowledging Mother's status as a pro se litigant.  It is well-settled that "[w]hile a party who chooses to represent himself or herself is entitled to the fair and equal treatment of the courts, [p]ro se litigants are not . . . entitled to shift the burden of litigating their case[s] to the courts." *Chiozza v. Chiozza*, 315 S.W.3d 482, 487 (Tenn. Ct. App. 2009) (internal citations omitted).  Mother first raised a number of issues on appeal relating to the underlying dependency and neglect proceeding.  These issues are not properly before this court, which is specifically tasked with review of the termination proceeding. *In re Carrington H.*, 483 S.W.3d at 536.

Second, Mother argues that she was prejudiced by the ineffective assistance of counsel at trial and now on appeal.  We first note that Mother proceeded pro se both at the trial court level and now on appeal.  Additionally, our Supreme Court has definitively ruled that a parent may not collaterally attack the termination of his or her parental rights based upon the alleged ineffective assistance of appointed counsel. *Id.* at 535 ("[W]e decline to hold that securing the constitutional right of parents to fundamentally fair procedures requires adoption of an additional procedure . . . by which parents may attack the judgment terminating parental rights based upon ineffective assistance of appointed counsel.").  This argument is without merit.

Next, Mother questions the qualifications of Ms. Price and Ms. Ford and the truthfulness of their testimony.  The record reflects that these issues were not raised before the trial court, resulting in waiver.  A party may not offer a new issue for the first time on appeal. *Lane v. Becker*, 334 S.W.3d 756, 764 (Tenn. Ct. App. 2010) (citation omitted).

Finally, Mother questions the sufficiency of the evidence supporting the termination decision.  While Mother's brief is woefully deficient in her discussion of these issues, we will address each ground in turn as required by our Supreme Court. *In re Carrington H.*, 483 S.W.3d at 525–26 ("[T]he Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

A.

As indicated above, the trial court granted the termination petition based upon the statutory grounds of (1) abandonment by failure to visit; (2) substantial noncompliance with the permanency plans; and (3) the persistence of conditions which led to removal.

### 1. Abandonment by failure to visit

Parental rights may be terminated for abandonment when a parent fails to visit a child for a period of four consecutive months immediately before the filing of a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(A)(i). A failure to visit "means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The statute requires that parents offer their children more than "token visitation," defined as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C).

A parent may assert as an affirmative defense pursuant to Tennessee Rule of Civil Procedure 8.03 that his or her failure to visit was not "willful." Tenn. Code Ann. § 36-1-102(1)(I). The burden is on the parent asserting the defense to prove by a preponderance of the evidence that his or her failure to visit was not willful. *Id.*; *In re Kolton C.*, No. E2019-00736-COA-R3-PT, 2019 WL 6341042, at *5 (Tenn. Ct. App. Nov. 26, 2019).

Here, the petition was filed on January 17, 2023. The relevant four-month period is from September 17, 2022, through January 16, 2023. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at *6 (Tenn. Ct. App. Feb. 20, 2014) (providing that the statutory four-month period covers four months preceding the day the termination petition was filed and does not include the day petition was filed). The trial court found that Mother had abandoned the Child by her failure to visit, having attended one virtual visit during the pertinent time period. There is no dispute that Mother only visited the Child once in the four months immediately preceding the filing of the termination petition. Mother offered no explanation as to her failure to visit. With these considerations in mind, we affirm the trial court's determination on this ground of termination.

### 2. Substantial noncompliance with the permanency plans

A court may terminate a parent's parental rights when the parent is in "substantial noncompliance . . . with the statement of responsibilities in a permanency plan." Tenn. Code Ann. § 36-1-113(g)(2). To terminate parental rights under this ground, the court "must first find that the plan requirements are reasonable and related to conditions that necessitate foster care placement." *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *10 (Tenn. Ct. App. June 10, 2014). "Conditions necessitating foster care

placement may include conditions related both to the child's removal and to family reunification." *In re Valentine*, 79 S.W.3d at 547. "The trial court must then find that the noncompliance is substantial." *In re Hannah H.*, 2014 WL 2587397, at *10 (citation omitted). When determining whether a parent's noncompliance with a plan was substantial, the court must do more than "count[ ] up the tasks in the plan to determine whether a certain number have been completed." *In re Carrington H.*, 483 S.W.3d at 537. DCS must show "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548–59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

The record reflects that Mother offered no evidence to establish her housing, her income, or her sobriety, failed to maintain consistent visitation, and repeatedly failed or refused to submit to drug screens throughout the custodial episode. While she participated in parent education and may have completed some assessments, her compliance cannot be deemed substantial under the circumstances presented. With these considerations in mind, we affirm the trial court's determination on this ground of termination.

### 3. Persistence of conditions

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and

convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

The record reflects that the conditions which led to removal in October 2021 were child safety concerns due to housing instability, lack of income, and drug abuse. The evidence confirms that Mother was in no better position to care for the Child than she was at the time of removal, as evidenced by her refusal to submit to drug testing in February 2024, just two months before the termination hearing, and her failure to provide evidence of housing and income to support the Child. Following our review of the record, we conclude that there is little likelihood that the conditions which led to removal will be remedied at an early date. The continuation of Mother's relationship with the Child greatly diminishes his chances of early integration into a safe, stable, and permanent home. We affirm the trial court on this ground of termination.

B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of Mother's parental rights was in the best interest of the Child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A)    The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

- 9 -

(B)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)    Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)    Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)    Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)    Whether the child is fearful of living in the parent's home;

(G)    Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)    Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)    Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)    Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K)    Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)    Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that

terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's). We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case because many of these factors touch on similar factual predicates and involve similar issues. *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

We consider first the Child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (H) (concerning attachment to others), and (I) (concerning relationships with others). With respect to these factors, the Child has bonded with his foster family, who expressed a desire to adopt him and described a loving environment with a foster sibling and extended family. The Child did not evidence signs of attachment with Mother, who failed to maintain consistent visitation. The Child did not even recognize Mother at the most recent visitation prior to the termination hearing.

We turn next to the Child's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbate the children's experience of trauma or post-traumatic symptoms), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). Mother has failed to establish her ability to provide a suitable home free from drug use. She has consistently tested positive for illegal substances or has refused testing for such substances throughout the custodial episode. She also failed to establish the ability to house the Child and provide safe and stable care for him.

Next, we consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the Child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (concerning whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances), (L) (concerning DCS's efforts in assisting the parent), and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Mother has not exhibited a sense of urgency in addressing the circumstances which led to removal and has not established a lasting adjustment of circumstances. We acknowledge Mother's expression of remorse, and we have no question that she desires to maintain a loving relationship with the Child; however, the Child has

- 12 -

lingered in custody while DCS repeatedly attempted to assist Mother, who failed to maintain communication and moved frequently.

With regard to support and knowledge of the Child's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs), the record reflects that Mother remitted some support and provided some items during visitation. However, she has failed to address the Child's most important needs, namely a stable home free from illegal drugs.

The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Mother's parental rights was in the Child's best interest.

## V.    CONCLUSION

The judgment of the trial court is affirmed. The case is remanded to the trial court for such further proceedings as may be necessary and consistent with this opinion. Costs of the appeal are taxed to the appellant, Chanler L.

_____
JOHN W. McCLARTY, JUDGE